## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## LEXINGTON

| | |
|---|---|
| **BONNIE HOUF** | **CIVIL ACTION NO. 5:21-311-KKC** |
| **Plaintiff,** | |
| **V.** | **OPINION AND ORDER** |
| **PNC BANK, INC.** | |
| **Aka PNC Bank National Association** | |
| **Defendant.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on the motion for summary judgment (DE 34) filed by defendant PNC Bank, Inc.

Plaintiff Bonnie Houf is a former PNC employee. She had been working there for about 12 years when PNC fired her. She alleges the bank fired her because of her age. She was 64 at the time. PNC asserts that it fired her because she approved a transaction that was later proved to be fraudulent and caused the bank to lose $39,850. The bank moves for summary judgment in its favor. For the following reasons, the Court will grant the motion.

### I. Facts

Houf was born in 1956. PNC hired her in April 2008 as a Customer Service Associate II. She was 52. (DE 34-2, Houf Dep. 18, 19, Ex. C.)

In July 2012, PNC promoted Houf to Teller Banking Supervisor I, also known as "Teller Lead" at PNC's Georgetown Kroger branch in Georgetown, Kentucky,

reporting to Branch Manager Jane Offutt, who was 50 years old. (DE 34-2, Houf Dep. 20, 22, Ex. D; DE 34-4, Offutt Dep. 4, 11, 15.) Offutt was the only person who interviewed Houf for the position and is the person who hired her for the position. (DE 34-2, Houf Dep. at 22; DE 34-4, Offutt Dep. at 15.) As a Teller Lead, Houf was responsible for supervising, observing, and providing coaching to tellers; shipping and receiving money; training and mentoring new tellers at the branch including about risk policy, and procedures; and approving certain transactions for the tellers reporting to her. (DE 34-4, Offutt Dep. 15-16; DE 34-5, Offutt Aff. ¶ 21.)

On Friday, January 3, 2020, a customer deposited a check in the amount of $95,890 through the ATM at the Georgetown Kroger branch. (DE 34-4, Offutt Dep. 22; DE 34-5, Offutt Aff. ¶ 4.) The account into which the check was deposited was a relatively new account with an overdrawn account balance, it did not have any significant prior deposits, and it did not have any bills set up for payment out of the account or direct deposits set up into the account. (DE 34-5, Offutt Aff. ¶ 5.)

On Tuesday, January 7, 2020, the customer on that account returned to the Georgetown Kroger branch, seeking to withdraw $39,850.65 of the funds deposited on the previous Friday to purchase a cashier's check. (DE 34-4, Houf Dep. 20-21; DE 34-5, Offutt Aff. ¶ 6.)

When a transaction is processed against a recent large deposit, PNC branch employees are trained to look for "red flags" on the account. (DE 34-5, Offutt Aff. ¶ 9.) Examples of "red flags" include: (1) large checks deposited through an ATM; (2) an account that has been open for a short period of time; (3) whether there are

2

direct deposits going into the account; (4) whether bills are being paid out of the account; and (5) whether the account has a low or overdrawn balance. (DE 34-2, Houf Dep. 41; DE 34-4, Offutt Dep. 23-25; DE 34-5, Offutt Aff. ¶ 9.) Employees can request a "deposit verification" to determine if funds are available to cover the check being deposited before releasing any of the funds. (DE 34-4, Offutt Dep. 23.) An employee can request a deposit verification by either calling a department within PNC or submitting the request electronically. (DE 34-4, Offutt Dep. 23-24; DE 34-2, Houf Dep. 51.) The purpose of a deposit verification is to verify that the funds promised by the check are available and there are no holds or stop payments on the check. (DE 34-2, Houf Dep. 35-36.)

Teller Stacy Smith (then 43-years-old) assisted the customer. (DE 34-6, Cape Aff. ¶ 12; DE 34-2, Houf Dep. 32.) The Georgetown branch was short-staffed that day. Only Smith, Houf, and Offutt were present. (DE 34-2, Houf Dep. 32.) Smith, who reported to Houf, had worked at PNC for less than one year. (DE 34-2, Houf Dep. 39; DE 34-6, Cape Aff. ¶ 21.) Smith was not authorized to handle customer transactions exceeding $25,000. (DE 34-2, Houf Dep. 33.) Smith initially went to Offutt to sign off on the cashier's check the customer ordered, but Offutt was not available, so Smith asked Houf to sign the cashier's check. (DE 34-2, Houf Dep. 32-33.) Houf's transaction limit was $50,000. (DE 34-4, Offutt Dep. 21; DE 34-2, Houf Dep. 33.)

Houf both approved the January 7 transaction for Smith and signed the cashier's check. (DE 34-2, Houf Dep. 30, 33, 34. 36, 37; DE 34-6, Cape Aff. ¶¶ 15,

16.) When Smith processed the January 7 transaction, she should have requested a deposit verification to ensure that the funds were available, but she did not do so. (DE 34-4, Offutt Dep. 25-26; DE 34-2, Houf Dep. 25, 35, 136.) When Houf approved the January 7 transaction for Smith and signed the cashier's check, she should have reviewed the account for red flags and either asked Smith to request a deposit verification or requested one herself. Houf did not request the deposit verification or ask Smith to request one. (DE 34-2, Houf Dep. 37, 42-43; DE 34-4, Offutt Dep. 23, 27, 31-33; DE 34-6, Cape Aff. ¶ 12.)

Houf asserts she had trouble seeing the computer that day because she had eye surgery in December 2019. (DE 34-2, Houf Dep. 30-32, 122-23.) She had previously informed Offutt of this, and Offutt placed her at a "handicapped station," where she would not have as much interaction with customers and where the computer was closer to her than at other stations. (DE 34-2, Houf Dep. 31-32, 122-23.)

Houf stated that she did not conduct her own "due diligence" or request a deposit verification to make sure the January 7 transaction was not fraudulent. (DE 34-2, Houf Dep. 34-36.) She testified that, instead, she asked Smith if she "had completed everything" and Smith showed her on a computer screen that the funds were available in the account. (DE 34-2, Houf Dep 34-37.) Houf conceded that she should not have relied on Smith and that she should have conducted her own "due diligence" on the transaction but stated that she "couldn't see that day so [she] depended on someone else." (DE 34-2, Houf Dep. 37.)

4

Houf testified that, despite her vision problems, she was able to see on the computer screen that the funds were available in the account and was able to see that there had been a recent large deposit into the account. (DE 34-2, Houf Dep. 34-35, 36, 37-38.) Houf testified that Smith should have called and verified that the deposited funds were available. (DE 34-2, Houf Dep. 35-36.) Nevertheless, Houf did not ask Smith if she had requested a deposit verification (DE 34-2, Houf Dep. 52). Nor did Houf direct Smith to request a deposit verification. (DE 34-2, Houf Dep. 77.) Nor did Houf request a deposit verification herself. (DE 34-2, Houf Dep. 36-37)

Houf conceded that she could have called to request a deposit verification. (DE 34-2, Houf Dep. 38, 42, 46-47.) She also recognized that she was required to conduct her own due diligence before approving the transaction. (DE 34-2, Houf Dep, 37, 41.) Houf testified that she had "no idea what she was thinking" when she relied on an inexperienced teller to perform the due diligence on the transaction instead of doing it herself. (DE 34-2, Houf Dep 40.)

Around January 8 or 9, 2020, the Georgetown Kroger branch learned that the $95,890 check from the January 3 deposit had been returned as fraudulent. (DE 34-2, Houf Dep. 47; DE 34-5, Offutt Aff. ¶ 12.) Houf told Offutt that Smith had shown her that the funds were available in the account at the time of the transaction and had been available since the previous Friday. (DE 34-2, Houf Dep. 50-51.) On January 9, Offutt contacted PNC's Loss Prevention Department to report that the deposit had been returned and a cashier's check had been issued from the returned

deposit. (DE 34-5, Offutt Aff. ¶ 13.) As a result, PNC lost more than $39,000. (DE 34-5, Offutt Aff. ¶ 14.)

Houf testified that, in January or February 2020, Offutt began criticizing her job performance. (DE 34-2, Houf Dep. 88-89.) Specifically, Houf testified that Offutt would stand behind Houf while she answered phones and question the things Houf said while on the phone. (DE 34-2, Houf Dep. 88-89.) This occurred two or three times. (DE 34-2, Houf 90.) Offutt told Huff that PNC had recently changed its policy about how branch employees should answer the phone and provide account information to customers over the phone. (DE 34-2, Houf Dep. 90-91.)

By e-mail dated January 16, 2020, PNC Regional Manager Diane Richert asked Offutt what steps Smith and Houf took when they processed the January 7 transaction. (DE 34-5, Offutt Aff. ¶ 15, Ex. 1.) Offutt responded that Smith "only looked at the available balance in the account before she did the withdrawal (she stated she does not know why she did not perform a deposit verification)." (DE 34-5, Offutt Aff. ¶ 15, Ex. 1.) Offutt reported that Houf "only looked at the balance and saw the deposit on January 3rd before she entered her approval into the system. She trusted that Stacy had done her due diligence." (DE 34-5, Offutt Aff. ¶ 15, Ex. 1.)

On January 17, 2020, PNC notified eligible employees of their eligibility to participate in a voluntary retirement program ("VRP") and told them that they would receive a VRP packet within the next week. (DE 34-1, Schwartz Aff. ¶ 15.) To be eligible for the VRP, an employee must have: (1) worked in a Teller, Teller Lead,

or Branch Banker Associate role as of January 14, 2020; (2) had at least five years of adjusted service; and (3) been at least 55 years old as of December 31, 2019. (DE 34-1, Schwartz Aff. ¶ 14.) Houf received the VRP packet at the end of January. (DE 34-2, Houf Dep. 56, 58, 84, Ex. E.)

Eligible employees were required to notify PNC by February 27, 2020 whether they accepted or declined the VRP. (DE 34-2, Houf Dep.  84-85, Ex. E; DE 34-1, Schwartz Aff. ¶ 16.)

At the end of January 2020, Offutt called Houf into her office to participate in a phone call regarding the voluntary retirement package. (DE 34-2, Houf Dep. 58.) Houf testified that Offutt told Houf that retirement "might be something good for" her. (DE 34-2, Houf Dep. 62-63.) Offutt does not recall saying this and testified that she had no opinion about whether Houf should retire. (DE 34-4, Offutt Dep. 58.) Houf testified that she told Offutt she was not interested in retirement. (DE 34-2, Houf Dep. 56, 60.)

On February 5, 2020, Offutt reported the January 7 transaction to PNC's Employee Relations Information Center ("ERIC"). (DE 34-1, Schwartz Aff. ¶¶ 6-7; DE 34-4, Offutt Dep. 34, 36-37.) The ERIC is an Employee Relations hotline that PNC employees can call to express concerns and request help related to employment issues. (DE 34-6, Cape Aff. ¶ 4.) The ERIC consultant who takes the call assigns the case to a trained Employee Relations investigator. (DE 34-6, Cape Aff. ¶ 5.) The ERIC assigned the case to Employee Relations Area Manager Douglas

Cape (then 60-years-old) to investigate. (DE 34-4, Offutt Dep. 39; DE 34-6, Cape Aff. ¶¶ 12-13.)

As part of his investigation, Cape reviewed various PNC documents and spoke with Offutt and Audra Sisti, PNC Vice President-Distribution Risk Oversight. (DE 34-6, Cape Aff, ¶ 14.) During the investigation, Cape confirmed that neither Houf nor Smith requested a deposit verification before Houf approved the transaction. (DE 34-6, Cape Aff, ¶ 17.)

Following his investigation, Cape concluded that Houf violated PNC's transaction processing guidelines by approving the transaction and signing the cashier's check without doing any of her own required due diligence or requesting a deposit verification. (DE 34-6, Cape Aff., ¶ 19.)

On February 27, 2020, Offutt texted Houf asking if she signed the form for early retirement, and Houf told Offutt she did not. (DE 34-2, Houf. Dep. 64-65; DE 38-4, Houf-Offutt Text Messages.) PNC asserts that Houf did not accept or decline the VRP by February 27, 2020. (DE 34-1, Shwartz Aff. ¶ 18). Houf testified that she declined it. (DE 34-2, Houf. Dep. 84-85.) Either way, the effect was the same because, if an employee did not accept or decline the VRP offer by the February 27 deadline, they were considered to have declined it. (DE 34-1, Schwartz Aff., ¶ 17.)

On March 2, 2020, Houf received her yearly evaluation from Offutt. (DE 34-2, Houf Dep. 27.) The evaluation found that Houf met all expectations for the previous year, and Houf received a 2.25 percent raise. (DE 34-2, Houf. Dep. 27; DE 38-6, Evaluation; DE 34-4, Offutt Dep. 18-19.)

The PNC guidelines for banking transactions at the time provided that a Teller Lead who committed a transaction processing violation that resulted in a loss of more than $3,500 could be terminated. (DE 34-6, Cape Aff., ¶ 11.) At PNC, the ER Investigator makes a recommendation about any discipline to be issued following the investigation and discusses that recommendation with the employee's manager. (DE 34-6, Cape Aff., ¶ 20.)

On or about March 4, 2020, Cape recommended to Offutt that PNC terminate Houf's employment based on Houf's conduct, her position as a Teller Lead, and the amount of the loss. (DE 34-6, Cape Aff., ¶¶ 21-22.) He recommended that Smith only be placed on probation because she was a teller who did not have authority to approve the transaction. (DE 34-6, Cape Aff., ¶¶ 21-22.)  Offutt agreed with the recommendation to terminate Houf's employment. (DE 34-6, Cape Aff., ¶¶ 22-23.)

On March 6, 2020, Houf began her shift at the bank at 8:30. (DE 34-2, Houf Dep. 28-29.) Offutt and Regional Manager Diane Richert, who was Offutt's manager, called Houf into Offutt's office and notified her that her employment with PNC was terminated because of the January 7 transaction. (DE 34-4, Houf Dep. 28-30, 58.) Smith was placed on probation for her role in the fraudulent transaction. (DE 34-4, Offutt Dep. 46-47.)

Offutt testified that, during Houf's employment at PNC, Houf was a "very good employee," explaining that she was "very conscientious, very dependable," and the "customers loved her." Anything that Offutt asked Houf to do, she "cheerfully

9

would do." (DE 34-4, Offutt Dep. 16.) Offutt had never disciplined Houf prior to terminating her. (DE 34-4, Offutt Dep. 17.)

Houf filed a charge of discrimination against PNC with the Equal Employment Opportunity Commission and exhausted all administrative remedies. She then filed this action asserting a claim for age discrimination under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.* That statute "prohibits an employer from discriminating against an employee over the age of forty because of the employer's age." *House v. Rexam Beverage Can* Co., 630 F. App'x 461, 463 (6th Cir. 2015).

## II.  Analysis

To survive summary judgment, Houf "must show a genuine dispute of material fact that, if resolved in her favor, could persuade a reasonable juror that age was the but-for cause of her termination." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Court evaluates the claim through the "three-step burden shifting analysis" set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06 (1973*). Pelcha*, 988 F.3d at 324. Under that analysis, Houf has the initial burden of establishing a prima facie case of age discrimination. *Id*. at 324-25. To do so, she must show: (1) membership in a protected group (over 40 years old); (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was replaced by a significantly younger person or PNC treated

a similarly situated and significantly younger employee more favorably. *See Pelcha*, 988 F.3d at 326; *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Waltherr-Willard v. Mariemont City Sch.*, 601 F. App'x 385, 388 (6th Cir. 2015).

PNC does not dispute that Houf is over 40, that PNC fired her, or that she was otherwise qualified for the Teller Lead position. Thus, the only issue on the prima facie age discrimination case is whether Houf has produced evidence that PNC either 1) replaced her with someone significantly younger or 2) treated a similarly situated and significantly younger employee more favorably.

### A.   Houf has not produced evidence that she was replaced by anyone.

Houf argues in her response brief that PNC replaced her with Sara Roberts, who was 37 at the time. Houf testified that, prior to her termination, Offutt asked Houf to train Roberts for Houf's job duties, including anything a Teller Lead would do. (DE 34-2, Houf Dep. 53-55, 85.) Houf asserts that Roberts then assumed Houf's Teller Lead duties after PNC fired her. (DE 34-2, Houf Dep. 66-67; DE 38, Pf.'s Resp. 13-14.) Houf points to no evidence supporting this assertion.

Houf cites statements that Smith made to Houf in texts. (DE 38 Response at 14.) Even if the Court could consider Smith's statements in the texts as evidence of Roberts' job duties after Houf left, they do not raise a factual issue as to whether Roberts replaced Houf as Teller Lead. In the texts, the only job duties that Smith states Roberts has assumed are "vault" duties. Smith does not state that Roberts is

11

a Teller Lead or that Roberts has assumed all Houf's job duties. (DE 38-3, Smith-Houf Texts.)

"[A]n employee's assumption of a terminated co-worker's job duties does not constitute replacement for purposes of an ADEA claim." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283-84 (6th Cir. 2012). "A person is not replaced when . . . the work is redistributed among other existing employees already performing related work." *Id.* at 284 (citation omitted). "Rather, a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* (quotations and citation omitted.) Smith's texts indicating that Roberts performed one or even some of Houf's prior job duties are not evidence that Roberts replaced Houf.

The undisputed evidence shows that PNC never hired anyone to replace Houf. Instead, Offutt testified that, a few weeks after PNC discharged Houf, the Georgetown Kroger branch shut down due to the COVID-19 pandemic. (DE 34-4, Offutt Dep. 54.) When it reopened around July 20, 2020, all branch employees became "universals," meaning they performed all branch banking duties, including the duties of the Teller Lead position. The Teller Lead position was eliminated. (DE 34-4, Houf Dep. 54-55.)

### B.   Houf has not produced evidence that a similarly situated substantially younger employee was treated more favorably than her.

Houf also fails to point to sufficient evidence to raise a factual issue as to whether any "similarly situated" and "substantially younger" employee was treated more favorably than her. In her response brief, Houf argues that Smith is similarly

12

situated to Houf, and that PNC treated her more favorably after the fraudulent transaction. There is no dispute that PNC fired Houf for her role in the January 7 transaction but only placed Smith on probation. Houf was 64 when she was terminated, and Smith was 43 at the time.

To be similarly situated to Houf, however, an employee must have (1) dealt with the same supervisor, (2) been subjected to the same standards, and (3) engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Pelcha*, 988 F.3d at 328; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citation omitted).

Smith and Houf did not hold the same positions and, thus, were not subject to the same standards. Houf was Teller Lead; Smith was a teller. (DE 34-4, Houf Dep. 39; DE 34-6, Cape Aff. ¶ 21.) Houf was Smith's supervisor. (DE 34-4, Houf Dep. 39.) As the Teller Lead, Houf was responsible for supervising and training tellers like Smith. (DE 34-5, Offutt Aff. ¶ 21.) Smith was not authorized to approve transactions like the January 7 transaction because she could not approve transactions over $25,000 (DE 34-2, Houf Dep. 33; DE 34-4, Offutt Dep. 21). Of the two, only Houf had the authority to approve the January 7 transaction because she had authority to approve transactions up to $50,000. (DE 34-2 Houf Dep. 33; DE 34-4, Offutt Dep. 21.)

PNC could lawfully hold Houf, as a supervisor, to a higher standard than her supervisee. *See Pelcha*, 988 F.3d at 328-29.   The fact that Houf was terminated for

her role in the January 7 transaction while Smith was only placed on probation is not sufficient for a prima facie case of age discrimination. "Firing the most senior employee responsible for mismanagement while maintaining . . . their subordinates, despite their involvement in the mismanagement," as PNC did here, "is an employment practice that is not unorthodox and is in fact common in some industries." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 894 (6th Cir. 2020).

Moreover, Smith and Houf did not engage in the same conduct. Only Houf approved the January 7 transaction. Only Houf signed the cashier's check. Smith was not authorized to do either of those actions.

C. **Houf has not produced evidence that PNC is using the January 7 transaction as a pretext to conceal age discrimination.**

Even if Houf could establish a prima facie case of age discrimination, her claim fails because she points to no evidence that PNC's stated reason for firing her is a "pretext to conceal that the true motive for her firing was her age." *Pelcha*, 988 F.3d at 326.

Under the *McDonnell Douglas* framework, once Houf produces sufficient evidence to establish a prima facie case of age discrimination, then the burden shifts to PNC to state a legitimate, nondiscriminatory reason for its actions. *Pelcha*, 988 F.3d at 325; see also *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). PNC has done this, stating that it fired Houf for violating its transaction processing guidelines by authorizing the January 7 transaction.

Once PNC articulates such a reason, the burden shifts back to Houf to produce evidence that PNC's stated reason is a "pretext to conceal that the true motive for her firing was her age." *Pelcha*, 988 F.3d at 326. She must "produce sufficient evidence from which a jury could reasonably reject [PNC's] explanation of why it fired her." *Blizzard*, 698 F.3d at 285 (citation omitted.)

Plaintiffs typically show pretext in one of three ways: (1) that the proffered reason has no basis in fact, (2) that the proffered reason did not actually motivate the employer's action, or (3) that the proffered reason was insufficient to motivate the employer's action. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The plaintiff can, of course, demonstrate pretext in other ways. The three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). "So plaintiffs remain free to pursue arguments outside these three categories." *Miles*, 946 F.3d at 888.

In her response brief, Houf does not argue that PNC's proffered reason for firing her does not have any factual basis. In fact, she "admits to not completing a transaction verification for the January 7 transaction." (DE 38, Pf. Resp. 15.) She argues, however, that the January 7 transaction did not actually motivate her termination. To raise a factual issue here, Houf must provide evidence "which tend[s] to prove that an illegal motivation was more likely than that offered by the defendant." *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 82 (6th Cir. 2020) (citation omitted).

15

As evidence that her age was the real reason PNC fired her, Houf points to 1) Offutt's alleged statement that retirement might be good for Houf and to Offutt allegedly becoming more critical of Houf after she learned that Houf declined the retirement package; and 2) Employee Relations Manager Cape recommending in e-mails to PNC Vice President-Distribution Risk Oversight Audra Sisti that PNC take "one step back," from termination for the signer of the cashier's check. (DE 38, Response at 15-16.)

However, the evidence does not establish an issue of fact on whether PNC fired Houf because of her age. As to evidence that PNC fired Houf because she did not accept early retirement, such evidence could be construed as evidence of age discrimination. Only employees 55 or older were eligible for early retirement. Thus, evidence that PNC terminated those employees who did not accept early retirement could be interpreted as evidence that PNC sought to terminate the employment of anyone 55 or older.

The evidence establishes, however, that 13 other employees in PNC's Kentucky Market who were eligible for early retirement did not accept the offer. Only Houf and one other employee were terminated after declining the offer. Eight were still employed by PNC as of May 2023 and three later retired. (DE 34-1, Schwartz Aff. ¶¶ 19-21.) A jury could not reasonably determine that PNC fired Houf because she did not accept early retirement when eight employees who also declined early retirement are still employed by the bank.

As to Cape's e-mail suggesting a "step back" from terminating the signer of the cashier's check, to the extent that this could be evidence of pretext, the undisputed evidence shows that this suggestion was based on Cape's misunderstanding of the transaction at the time of the e-mail. Cape incorrectly believed at the time that Smith was authorized to approve the January 7 transaction, that Smith did approve the transaction, and that Houf only signed the cashier's check. (DE 34-6 Cape Aff. ¶ 15.)

Cape e-mailed Sisti stating that he found the transaction was a "clear termination" offense for the person who authorized the transaction, but that normally the employee who authorizes the transaction and the employee who signs the cashier's check are the same individual. (DE 42, Cape-Sisti e-mails.) Because Cape incorrectly believed that the person who signed the check and the person who authorized the transaction were different people, he asked Sisti whether the bank should apply the same discipline to both employees. (DE 42 Cape-Sisti e-mails 3.)

Sisti responded that the "breach is at the point the withdrawal was approved. How the money was disseminated after the approval (cash or cashier checks) is after the fact." (DE 42 Cape-Sisti e-mails 3.) Cape responded that he believed the best approach then was to "recommend one step back for the cashier's check signer." He explained, "This is the same approach we take with a teller that misses steps but someone else approves the transaction and is ultimately responsible." (DE 42 Cape-Sisti e-mails 2.)

Cape eventually learned what is undisputed in this case: that Houf both approved the transaction and signed the cashier's check. The e-mails make clear that Cape believed termination was the appropriate discipline for the person who approved the withdrawal of funds. (DE 34-6, Cape Aff., ¶¶ 16-17, 19, 21.)

Houf also argues that the January 7 transaction was not sufficient to motivate her discharge. To make this showing, she must point to evidence that other employees "were not disciplined even though they engaged in substantially identical conduct." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Houf points out that Smith was not terminated after the January 7 transaction.

As discussed, Houf and Smith held different positions and were subject to different standards. Thus, Houf cannot establish that she and Smith engaged in substantially identical conduct. Of the two, only Houf approved the January 7 transaction and only Houf had the authority to do so.

### III.    Conclusion

For all these reasons, the Court hereby ORDERS that PNC's motion for summary judgment (DE 34) is GRANTED.

This 27th day of March, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

18